STATELER v. CALIFORNIA NAT. BANK OF SAN FRANCISCO et al.

(Circuit Court, N. D. California. November 19, 1896.)

No. 12,155.

1. FEDERAL COURTS—ENJOINING LITIGATION IN STATE COURTS—VIOLATION OF INJUNCTION—CONTEMPT.
    In 1889, the C. National Bank being found insolvent, a receiver of its property was appointed by the comptroller of the currency. Such receiver submitted himself and the affairs of the bank to the jurisdiction of the United States circuit court. A suit was afterwards begun in a state court by one C., a stockholder, for the benefit of the corporation, against three of the directors of the bank, to recover damages for losses caused through their negligence. In this action C. recovered a judgment, which, as against two of the defendants, he settled, upon their payment into court of a sum of money, and from which the other defendant, one T., appealed and secured a reversal. After the receiver of the bank had paid the creditors, one S. was chosen by the stockholders, pursuant to the statute, as agent to wind up the bank's affairs. S. applied to the state court for an order directing the fund in its custody to be paid over to him. The court refused the order, but on appeal this decision was

reversed, and the fund, less proper allowances to C. for attorney's fees, etc., was directed to be turned over to S. S. commenced a suit in the United States circuit court to establish his rights to the position of agent, and as such to have possession of all assets of the bank, and to enjoin any further litigation about the same; and in this suit the court granted a temporary injunction restraining C., his attorneys, etc., from commencing any further litigation, from attempting to take control of any of the assets of the bank, and from attempting to settle or allow any attorney's or other fees growing out of the past litigation. S. subsequently obtained orders to show cause why C. and his attorneys should not be punished for contempt in violating this injunction—First, by applying to the state court to make an allowance of attorney's fees out of the funds in its custody; and, second, for applying for writs of error to review the judgment in favor of T., the director who had not settled in C.'s suit, and the order directing the fund in the state court to be paid over to said S. as agent, in both which writs the bank was made plaintiff in error, and the second of which was sued out against S. as defendant in error. *Held,* that C. was technically guilty of contempt, in violating the injunction by applying to the state court for an allowance of fees, by using the name of the bank on the first writ of error, and by prosecuting the second writ of error while enjoined from attempting to take control of any assets of the bank; but having abandoned the first proceeding on being advised that it was a violation of the injunction, and his counsel having been of opinion that the writs of error were not prohibited by it, he should be fined only the costs of the proceedings.

2. SAME.
    *Held,* further, that the injunction prohibiting C. from instituting proceedings to obtain control of the assets of the bank did not contravene the provisions of section 3 of the act of August 13, 1888, since the United States circuit court had taken jurisdiction in S.'s suit of the disposition of the assets of the bank, and any proceedings against S. were within its general equity jurisdiction.

3. VIOLATION OF INJUNCTION—PARTIES.
    *Held,* further, that as to certain parties, who disclaimed any knowledge of or participation in the acts of C. and his attorneys, the proceedings should be dismissed.

4. SAME—FINES.
    *Held,* further, that as C.'s attorney denied by affidavit any knowledge of the existence of the injunction at the time he applied for the allowance and sued out the first writ of error, he must be considered as purged of contempt in those matters, but, as to the second writ of error, he was guilty of contempt, though, as he alleged that he did not understand the injunction to prohibit suing out the writ, he should be fined only the amount of the costs.

Pierson & Mitchell (Robert Friedrich, of counsel), for complainant.
Joseph C. Campbell, for respondent E. G. Knapp.
John Chetwood, Jr., and A. W. Thompson, in pro. per.

MORROW, District Judge (orally).   This is a proceeding for the punishment of the respondents for contempt of the authority of this court, by resisting the provisions of an injunction issued in this case by Judge Beatty on Feb. 24, 1896.   The original action was brought Jan. 4, 1896, to secure a judgment and decree of this court adjudging, among other things, that the complainant was the duly elected, qualified, and acting agent of the defendant, the California National Bank of San Francisco, and as such exclusively entitled to have and receive in his custody and under his control all the moneys and property of said bank, and to collect the outstanding indebtedness due to said bank, whether the same be evidenced by open accounts, bills, notes, or judgments of record, to the end that the affairs of the bank might be wound up, its property converted into money, and its money distributed among its shareholders, as provided by the national bank-

ing laws of the United States; that all the acts of the defendant banking association through its alleged board of directors, as set forth in the bill, since the appointment of a receiver to take charge of its affairs, be adjudged null and void, and that its board of directors has no authority to take any action touching the affairs of the association; that the said bank, its board of directors, officers, and employés, and John Chetwood, Jr., his agents and servants, and each and every of their attorneys, solicitors, and counselors, be forever restrained and enjoined from denying the rights of the complainant to the said office of agent of said banking association, and from denying his right as such to the exclusive control of the assets of said bank, and from commencing any further litigation against him as such agent, and from prosecuting or defending any actions heretofore brought by them, or either of them, against the complainant, as such agent, touching his right to said office, and touching his exclusive right as such agent to collect the assets of said bank; and that the said bank, its board of directors, officers, and employés, and the said defendant Chetwood, his agents and servants, and each and every of their said attorneys, solicitors, and counselors, be forever restrained and enjoined from commencing any further suits to collect any outstanding debts due said bank, whether the same be evidenced by an open account, note, or judgment, and particularly from attempting in any manner to collect the judgment heretofore secured for said bank against one Richard P. Thomas, and referred to in the bill. Upon this bill an order was made by the court on January 6, 1896, requiring the defendants to show cause why an injunction should not issue pending the determination of the matter involved in the suit; and upon the hearing of the order to show cause the court issued an injunction pendente lite restraining and enjoining the California National Bank of San Francisco, its directors, officers, and employés, and said John Chetwood, Jr., his agents, servants, attorneys, solicitors, or any other representatives, from commencing any further litigation, and from commencing any further suits, to collect any outstanding debts due said bank, whether the same be evidenced by open accounts, bills, notes, or judgments, or otherwise, or from in any way whatever taking, or attempting to take, any control or possession of any of the funds or assets or property of the said bank, and from settling and allowing, or attempting to settle or allow, any attorney's charges, or any other fees, expenses, or costs, growing out of, or which it may be claimed grew out of, any past litigation in this matter, and from in any way disposing of or incumbering any of the assets, money, or property of said bank. But the defendants were not enjoined from prosecuting or defending to final determination any action in this matter then pending in the supreme court of the state of California, or in this court.

It appears that on the 14th day of January, 1889, the comptroller of the currency, after an examination into the condition of the California National Bank of San Francisco, declared the corporation insolvent, under section 1 of the act of congress authorizing the appointment of receivers of national banks, and for other purposes, approved June 30, 1876, and thereupon appointed Smith P. Young receiver to take

charge of its affairs; that on February 21, 1889, the said receiver submitted himself and the affairs of said bank to the jurisdiction of this court by a petition asking for the authority of the court to sell certain property belonging to the bank; that on the 6th day of July, 1894, the comptroller of the currency, having paid to the creditors of the bank the full amount of their claims, and all expenses of the receivership, and the redemption of the circulating notes having been provided for, a meeting of the shareholders was called for the purpose of having the shareholders determine whether the receiver should be continued and wind up the affairs of the association, or whether an agent should be elected for that purpose. It is alleged that at this meeting 1,020 out of the 2,000 shares constituting the entire capital stock of said banking association were represented and voted, and that the said 1,020 shares voted in favor of electing an agent to succeed the receiver, and thereupon T. K. Stateler was elected agent of the bank for the purposes set forth in the statute, and entered upon the duties of his office. It appears further that at the time the bank suspended payment, and at the time the comptroller of the currency declared it to be insolvent, and at the time he appointed a receiver to take charge thereof, its board consisted of seven members, to wit, R. P. Thomas, president; R. A. Wilson, vice president; R. R. Thompson, George E. Whitney, William K. Vanderslice, Charles H. Holt, and B. Noyes; that on the 19th day of July, 1890, and while the receiver was in office, John Chetwood, Jr., holding 20 shares of the capital stock of said banking association, commenced a suit in the superior court of the city and county of San Francisco against the said California National Bank of San Francisco, Richard P. Thomas, Robert R. Thompson, Robert A. Wilson, and S. P. Young, receiver of the said bank, to recover from the defendants Thomas, Thompson, and Wilson, as the executive committee of the board of directors of the bank, the sum of $400,000 as damages for negligence, being the amount claimed by the plaintiff to have been lost to the bank by reason of unfortunate investments made by the cashier, and which losses the plaintiff, Chetwood, claimed could not have occurred if the said three defendants in that action had properly supervised the acts of the cashier. All the defendants appeared in the action, and the case was tried on the 27th day of April, 1894, resulting in a judgment in favor of the plaintiff, Chetwood, for the benefit of the corporation, as against the defendants Thomas, Thompson, and Wilson, for an amount equal to the actual loss of the bank resulting from the bad investments made by the cashier. The matter was referred to a referee to ascertain the amount of such bad investments, who filed a report on the 17th day of August, 1894, from which it appeared that the loss sustained by the bank from such bad investments amounted to $197,092.91; that on the 24th day of September, 1894, a stipulation was filed in the action whereby the complainant, Chetwood, withdrew his cause of action against the defendants Thompson and Wilson, and directed a judgment of dismissal to be entered accordingly. Part of the consideration for such dismissal was the payment by the said Thompson and Wilson into court of the sum of $27,500. On the 20th day of November, 1894, findings were filed in

the said superior court, in said action, in which it was found that the amount of the actual loss to the corporation through the negligence of the said three defendants was the sum of $166,919; that $27,500 had been paid thereon by Thompson and Wilson, leaving the net loss to the bank the sum of $139,419, for which amount the court ordered a judgment to be entered against the defendant Richard P. Thomas, who appealed from the judgment to the supreme court of the state, where the judgment of the lower court was reversed, with directions to the trial court to enter a judgment in favor of the defendant Thomas; the supreme court holding that, where several defendants are charged as joint tort feasors, a release of any one of them, by withdrawal of the action against him, or the payment of a sum agreed upon between him and the plaintiff, operated to release other defendants from all further liability. 45 Pac. 704.

It appears further that after the entry of the judgment in the superior court, as before mentioned, Stateler, as agent of the bank, petitioned the court for an order requiring Chetwood to turn over to him the $27,500 received by Chetwood in that action. The superior court refused to make that order, and Stateler appealed to the supreme court of the state, where the order of the superior court was reversed, the supreme court holding that where an action brought by a stockholder in a national bank in behalf of the corporation while in the hands of a receiver, has terminated, an agent of the corporation elected to succeed the receiver, as provided by law, and charged with the duty of controlling and disposing of its assets and of distributing the proceeds, is entitled to receive the proceeds of such action, less reasonable allowance to the plaintiff for his costs, disbursements, and attorney's fees. Some question was raised in the supreme court concerning the regularity and validity of the proceedings of the shareholders which resulted in the election of Stateler as agent of the bank, and the assignment to him by the comptroller and the receiver of the assets of the corporation; but the court held that Stateler being de facto the agent, and presenting his commission from the comptroller, reciting his appointment and the regularity of the proceedings attending it, the question of the regularity of his appointment was not to be raised upon collateral attack in that action. 45 Pac. 854.

There are two petitions, in the form of affidavits, before the court, charging the respondents with the violation of the injunction issued out of this court on February 24, 1896. Both of these petitions are signed by T. K. Stateler. The first, after referring to the injunction, sets forth that on the 19th day of September, 1896, the said John Chetwood, Jr., caused to be filed in the superior court of the city and county of San Francisco, state of California, in an action then pending therein, entitled "John Chetwood, Jr., Plaintiff, vs. The California National Bank of San Francisco, et al., Defendants," and numbered 30,052 on the files of said court, a notice that on the 25th day of September, 1896, at 10 o'clock a. m., he would apply to said court to make an allowance out of the funds on deposit in said court to the credit of the above-entitled action to him for alleged costs, disbursements, expenditures, expenditures, attorney's and counsel fees claimed to

have been made and incurred by him, and about to be made and incurred by him, in behalf of the defendant banking corporation and the stockholders thereof, and which said fund belongs to the defendant bank, and which is the fund particularly referred to in the amended bill of complaint herein, a copy of which notice is attached to the affidavit; that thereafter the hearing of said motion was continued until the 2d day of October, 1896, whereupon the attention of said superior court was called to the issuance of the injunction out of this court, and the said superior court thereupon continued the hearing of said motion for allowance two weeks until the 16th day of October, 1896; that W. H. Metson, of the firm of Reddy, Campbell & Metson, who signed said notice, along with Thompson & Thompson, as the attorneys for the plaintiff, stated upon said hearing that he was ignorant of the issuance of said injunction, and that neither he nor his firm would proceed any further in support of said motion while said injunction stood; that thereafter an application was made to this court for an order modifying the injunction so as to permit the respondents to apply to the said superior court for an allowance of the fund therein belonging to the bank for attorney's fees and costs, and the application was denied; that four days had expired since said last-named date, and the said John Chetwood, Jr., has failed, neglected, and refused to withdraw the motion in said superior court for a further allowance out of said fund, but the said motion is now pending; that the affiant is informed and believes that said fund will not be turned over to the statutory agent of the bank while the motion of the said defendant John Chetwood, Jr., is pending in said superior court for a further allowance out of said fund; and that in maintaining said motion the said John Chetwood, Jr., and his attorneys, Thompson & Thompson, and his counsel, E. G. Knapp, are openly defying the order and writ of this court.

The first order to show cause relates to the action of respondents with respect to the case just described in the state court, and the petition now under consideration has particular reference to the action of Chetwood in seeking to secure an order of the superior court making him an allowance out of the fund of $27,500, in the custody of the court, for his costs, disbursements, expenditures, and for attorney and counsel fees on account of services rendered and to be rendered by him. This action was specifically prohibited by the injunction in this case granted by Judge Beatty on February 24, 1896. The respondent contends that he was entitled to make that application to the superior court because of the provision contained in the judgment of the supreme court reversing the order of the superior court, "with directions to the trial court to enter the order prayed for, after making reasonable allowance to plaintiff, Chetwood, for his costs, disbursements, and attorney's fees in the said action, as contemplated by law." It was, however, in direct conflict with the terms of the injunction issued out of this court. Moreover, it does not appear that the supreme court had been advised of the fact that Chetwood had already been allowed and paid out of the fund in the superior court the sum of $560.16 for expenses claimed to have been incurred by him in prosecuting the action in the superior court, and

$9,000 for attorney's fees, and an additional sum of $1,000 for the payment of detectives to find the property of the defendant Thomas. It was for the purpose of protecting the balance, $16,940, remaining out of the $27,500 obtained on the judgment against Thompson and Wilson, that the present action was instituted in this court by Stateler against the California National Bank and John Chetwood, Jr., and the injunction was issued. The affidavits of E. G. Knapp and W. H. Metson show that they knew nothing of the injunction when they appeared in the superior court, on behalf of Chetwood, in support of his application for the allowance mentioned; and the affidavit of A. W. Thompson shows that, within a month after the injunction was issued in this case, he withdrew from the litigation in which Chetwood was engaged in these cases, and, while he has been attorney of record, he has taken no part in the proceedings.

The second order to show cause relates first to the petition of Chetwood, Knapp, Thompson, Vanderslice, Holt, and others, presented to the Honorable Stephen J. Field, associate justice of the supreme court of the United States, for a writ of error from the supreme court of the state of California to the supreme court of the United States to review the judgment of the supreme court of this state in reversing the judgment secured by Chetwood against Thomas, and, for the purpose of said writ of error, made the California National Bank the plaintiff in error; and Richard P. Thomas and John Chetwood, Jr., the defendants in error. The names of Knapp and Thompson were signed to that petition as attorneys for the said bank. The second order to show cause relates also to a petition presented by John Chetwood, Jr., and E. G. Knapp to the Honorable W. H. Beatty, chief justice of the state of California, for a writ of error to the supreme court of the United States to review the order of the supreme court of the state of California, which directed the fund in the superior court to be turned over to Stateler, as the agent of the bank, and, for the purpose of obtaining that writ, entitled the proceeding:

"The California National Bank of San Francisco and John Chetwood, Jr., Representing Stockholders, Plaintiffs in Error, vs. T. K. Stateler (Agent), S. P. Young (Receiver), Robert A. Wilson, Richard R. Thompson, and Richard P. Thomas, Defendants in Error."

In that petition, E. G. Knapp was represented as the attorney for said bank. It appears that the attorney of record for the bank, in the superior court, in said suit of Chetwood v. California National Bank of San Francisco et al., has at all times been H. D. Talcott, Esq., but that the bank did not appear on either of said appeals in the supreme court of the state, nor was any petition for a rehearing ever filed on either of said appeals by said bank, or by any one else in the name of the bank, and that Stateler has given no authority to any one to represent said bank, but, prior to the issuance of the writs of error mentioned, caused his attorney to notify the attorneys for Chetwood that if any attempt was made by him, or the officers of the bank, or their attorneys, to further delay the turning over of said fund to the complainant in this case, as the agent of the bank, it would be considered by him an open contempt

of the United States circuit court, and would be reported to said court for action. From the affidavits that have been filed, it appears, as before stated, that, soon after the injunction was issued in this case, Mr. A. W. Thompson withdrew from the litigation in which Chetwood was engaged, and has taken no part in the proceedings. It appears also that Knapp knew nothing of the injunction when he sued out the first writ of error.

There is a rule of law, with respect to contempt of court, which determines that if the person charged comes into court, and purges himself of contempt by an affidavit showing that he did not do any of the things charged against him, or that he had no notice that he was violating the order of the court, the order to show cause will be discharged, because it is said that, the accused having fully purged himself of contempt, the court will go no further. If, in his affidavit, he has stated any fact that is denied and made a matter of issue, that issue must be tried elsewhere, because the court is not authorized to try any question of fact in this character of proceedings. Therefore, in this case the court must accept these affidavits made by the respondent as true. It may be, however, that the affidavits on the part of the respondent disclose a case where the court would say that a contempt had been committed, notwithstanding the affidavit, because the facts set forth in the affidavit did not meet fully the facts set forth in the papers on the order to show cause. In this case Mr. A. W. Thompson shows by his affidavit that he is not an attorney in these cases, that he has had nothing whatever to do with them, and that the use of his name has been practically unauthorized, although he does not quite go that far. He says he has been ready to sign an order of substitution whenever he should be advised of the name of the person who was to take his place. But he says he has not acted in the matter, has given no authority to act in the matter, and knows nothing about these proceedings, or about the injunction. I must accept that affidavit as true. Therefore the order to show cause in his case must be discharged.

Mr. Mitchell: Both orders?

The Court: Yes; both orders in the case of Thompson.

With respect to Mr. Vanderslice, he also, by his affidavit, sets up that he does not know anything about these proceedings. Therefore I shall discharge the order to show cause in his case, on the second order.

With respect to this feature of the case, I will refer to the case of Pettibone v. U. S., 148 U. S. 197, 13 Sup. Ct. 542. It was a case which arose in Idaho. The parties were indicted for a conspiracy to violate an injunction which had been issued by a United States court. The same principle of law would obtain with respect to an order to show cause why respondent should not be punished for a contempt of court. It appears that the parties who had violated the injunction had not been notified of the order of the court. The court says:

"The combination to commit an offense against the United States was averred to consist of a conspiracy against the state, and the completed act

to have been in pursuance of such conspiracy; but the pleader carefully avoided the direct averment that the purpose of the confederation was the interruption of the courts of justice in the United States court. Nor did the indictment charge that the defendants were ever served with process, or otherwise brought into court, or that they were ever in any manner notified of the issue of the writ, or of the pendency of any proceedings in the circuit court."

### This is a reference to the injunction.

"That this omission was advisedly made is apparent from the statement in the bill of exceptions that there was no evidence given on the trial showing, or tending to show, that the writ of injunction mentioned and set forth in the indictment was served upon the defendants, or either of them, or that they, or either of them, had any notice or knowledge of the issue thereof."

The judgment of the court was that in view of the fact, among other things, that the defendants had no notice of the injunction, the judgment of the court below be reversed, and the cause remanded, with instructions to quash the indictment and discharge the defendants. The doctrine here announced is applicable to this case. In the case of Mr. Knapp, it appears by affidavit that he did not know of this injunction when he made application to the court for the allowance of money and the expenses to Chetwood, and that, with respect to the first writ of error taken from the judgment of the supreme court of this state, he did not know at the time he made that application that there was any injunction pending, or any injunction in the case that prevented him from taking that action. With respect to the second writ of error,—the one signed by Chief Justice Beatty, of the supreme court of this state, —Knapp does not deny that he knew of the existence of the order at that time. But, as I understand, his affidavit and his statement is that he did not know that the order would be construed as a prohibition against a writ of error in this case. While he knew of the order, he did not so construe it. He read the order as permitting the appeal; that he understood that, when the order said it did not prevent the carrying of that case to a final determination, it did not prevent him from taking a writ of error in that case. Undoubtedly, the same argument would be based with respect to the first writ of error, that, if he had then known there was such an injunction, he would still have so construed it as permitting him to take a writ of error in that case.

With respect to the first order to show cause, and the first element of the second order, the proceedings against Mr. Knapp are discharged. That leaves the order against him involving the writ of error in the Stateler case, wherein he admits, or does not deny, that he knew of the existence of the order, but thought it did not prevent him from taking an appeal in that case. Before proceeding further, I will indicate my views with respect to this case, although it does not necessarily enter into the determination of the contempt proceedings, but in order that counsel may understand my views concerning these cases.

In addition to the cases cited yesterday, there is another case in the supreme court of the United States which passes upon the statute cited by Mr. Campbell. Mr. Campbell referred to section 3 of the act of August 13, 1888, providing:

"That every receiver or manager of any property appointed by any court of the United States may be sued in respect of any act or transaction of his in carrying on the business connected with such property, without the previous leave of the court in which such receiver or manager was appointed; but such suit shall be subject to the general equity jurisdiction of the court in which such receiver or manager was appointed, so far as the same shall be necessary to the ends of justice."

This particular statute was cited to the court as giving the right to any person to sue a receiver; that persons who had any claim against the receiver might sue him without applying for leave to the court of the United States in which the receiver was appointed, and he might prosecute that suit to final conclusion; and that, if this injunction prevented any one from availing himself of the provisions of this statute, the injunction was contrary to law, and was void; that in this case the right of these parties to prosecute this appeal not only was a right to carry the case to a final determination, growing out of the case, but was a right which was given to him by law. I do not so understand this statute, and I find my view of it is confirmed by the supreme court of the United States in Re Tyler, 149 U. S. 164, 13 Sup. Ct. 785. This was a case where certain railroad property in the possession of a receiver of the United States circuit court, in a cause within its jurisdiction and protected by its injunction, was levied upon by Tyler, as sheriff of Aiken county, S. C., under a tax execution or warrant issued by the county treasurer. The railroad company became subject to certain taxes in the states through which the road was operated. It was a provision of the law of the state that where taxes became delinquent an execution or warrant might be issued by the treasurer of the county where the property is located, and placed in the hands of the sheriff, and he was authorized to collect the taxes by the levy and sale of property. Tyler, the sheriff, was cited for contempt of court in interfering with the possession of the property by the receiver. There was a controversy concerning some portion of the taxes. The matter was brought up before the circuit court. Tyler was adjudged guilty of contempt of court. He applied to the supreme court of the United States, asking to be discharged on a writ of habeas corpus. In the supreme court of the United States the case was presented very strongly and ably by a number of distinguished lawyers, John Randolph Tucker being one of the attorneys for the petitioner. They set up the power of the state to collect taxes; that it was a power that could not be interfered with by the United States; that, by the statutes of the state, it was provided that the collection of taxes should not be stayed or prevented by any injunction, writ, or order issued by any court, or judge thereof; that it was a sovereign power belonging to the state by reason of its sovereignty as a state; and that any restraint or any action on the part of any court in preventing the state to satisfy its claims for taxes would be a direct assault on the independent sovereignty of the state. It is a very strong case,—there is no question about it,— where a sheriff, holding the warrant of the treasurer, which is substantially the warrant of the state, is authorized to collect taxes due to the state. It is true that there was some controversy as to

the amount of the taxes, but the sheriff was clothed with the sovereignty and power of the state to collect these taxes. Many cases were cited where the courts have said that the officer collecting taxes cannot be interfered with. But the supreme court of the United States held that this jurisdiction and authority of the receiver are exclusive. The supreme court, speaking through Chief Justice Fuller, said:

"No rule is better settled than that, when a court has appointed a receiver, his possession is the possession of the court, for the benefit of the parties to the suit and all concerned, and cannot be disturbed without the leave of the court, and that if any person, without leave, intentionally interferes with such possession, he necessarily commits a contempt of court, and is liable to punishment therefor [citing a number of cases]. Ordinarily the court will not allow its receiver to be sued touching the property in his charge, nor for any malfeasance of the parties or others, without its consent; and while the third section of the act of congress of March 3, 1887" [this is the statute referred to in the argument yesterday as permitting suits against the receiver], "now permits a receiver to be sued without leave, it also provides that 'such suit shall be subject to the general equity jurisdiction of the court in which such receiver or manager was appointed, so far as the same shall be necessary to the ends of justice.' Neither that, nor the second section, which provides that the receiver shall manage the property 'according to the valid laws of the state in which such property shall be situated,' restricts the power of the circuit court to preserve property in the custody of the law from external attack. In this case, instead of issuing an attachment against the petitioner at once for forcibly seizing the rolling stock of this railroad under the circumstances appearing upon the face of the record, the court adopted the course of serving him with a rule to show cause, and with an order restraining him in the meantime from interference with the property. The petitioner refused to release the property upon request of the receiver, and persisted in his attempt to hold possession thereof by force, in disregard of the order of the court. The general doctrine that property in the possession of a receiver appointed by a court is in custodia legis, and that unauthorized interference with such possession is punishable as a contempt, is conceded, but it is contended that this salutary rule has no application to the collection of taxes. Undoubtedly, property so situated is not thereby rendered exempt from the imposition of taxes by the government within whose jurisdiction the property is, and the lien for taxes is superior to all other liens whatsoever, except judicial costs, when the property is rightfully in the custody of the law; but this does not justify a physical invasion of such custody, and a wanton disregard of the orders of the court in respect of it. The maintenance of the system of checks and balances characteristic of republican institutions requires the co-ordinate departments of government, whether federal or state, to refrain from any infringement of the independence of each other, and the possession of property by the judicial department cannot be arbitrarily encroached upon, save in violation of this fundamental principle. The levy of a tax warrant, like the levy of an ordinary fieri facias, sequestrated the property to answer the exigency of the writ; but property in the possession of the receiver is already in sequestration, already held in equitable execution, and, while the lien for taxes must be recognized and enforced, the orderly administration of justice requires this to be done by and under the sanction of the court. It is the duty of the court to see to it that this is done, and a seizure of the property against its will can only be predicated upon the assumption that the court will fail in the discharge of its duty,—an assumption carrying a contempt upon its face."

I cannot imagine a stronger case, or stronger language, declaring the exclusive possession of the receiver, and that parties must not interfere with the receiver. If they have any claim against the property, they must go into the court where the receiver is appointed. If they have any actions against the receiver, they must go there with them. If they have claims of any character against the receiver, they must go to the court having possession of the

property. The reason of this doctrine is very clear, because, unless this jurisdiction is exclusive, it will necessarily result in destroying property, and wasting it in needless and useless litigation. We will have, as in this case, a number of suits,—so many, indeed, that when they come up in the various proceedings the court will find it difficult to get the bearings, in determining the relation and significance of the smallest order. It is plain that all this litigation ought to be carried on in one court, and as far as possible in one case. And, since this court obtained original jurisdiction over the bank and the receiver and agent, it is clear that the jurisdiction of this court over the litigation ought to be maintained. Moreover, any assumption, with respect to Mr. Stateler's position as the agent of this bank, that it can be better disposed of by some proceeding in the state court, would be assuming that this court would not perform its duty, or give proper construction to the law, or determine the rights of the parties correctly. It must be assumed that the jurisdiction is correctly given, and must be exercised. Personally, I could wish not to draw to this court any jurisdiction, unless it is clearly imposed upon it. But when the court finds that jurisdiction has been conferred, although the courts of the United States are courts of limited jurisdiction, it is the duty of the court to see to it that that jurisdiction is protected, and that litigants in this court are secure in their rights. This is the general law upon the subject. Many authorities might be cited to sustain the authority of the court in such a case as is here presented. Many authorities have been cited by counsel in this case to show the scope of the jurisdiction of the court where a receiver has been appointed. I draw the conclusion from this Case of Tyler that this statute of 1888 does not in any way limit the jurisdiction of this court, or its authority to protect the receiver, because this is a bill in equity; and Mr. Stateler is acting as the receiver of this corporation, under the law of the United States, and therefore must be protected in that respect. With respect to the proceedings in the state court, I am of the opinion that in the appeal in the main case of Chetwood v. California Nat. Bank, the writ of error may be prosecuted to the supreme court of the United States.

Mr. Mitchell: Thomas' appeal?

The Court: Yes; in the Thomas appeal case, by Mr. Chetwood; but that he is not authorized to use the name of the bank in that appeal. My present impression is that I am not depriving Mr. Chetwood of any opportunity to test any question that might arise between him and any other party involved in that case, in the supreme court. It is not my purpose to interfere with the final determination of the issues involved in that case, in whatever court may have jurisdiction, but I do not think he is entitled to use the name of the bank in that appeal.

With respect to the Stateler case, I am not quite so clear. It seems to me that the same principle that I have announced in the case just referred to, if applied in the Stateler case, will accomplish all that the court now thinks is within its jurisdiction, namely, that with respect to the Stateler case the name of the bank cannot be

used. It is true, it is said that the cause is being prosecuted for the purpose of having it determined whether or not Stateler was properly appointed and elected agent of the bank. That question, in my judgment, cannot be determined in that way. That is the question involved in this case here. That question must be determined in this case, and, whichever way the court determines it, an appeal will lie from such determination to either the court of appeals or the supreme court of the United States. That is the proper way to have that question determined. I cannot consent that the same issues shall be carried forward in two different actions,—one in the state court and one here. A multiplicity of suits must be prevented, and, in doing so, that question should only be raised and determined here in the court of original jurisdiction. I am not so certain but that there are other questions involved in the Stateler case.

Mr. Mitchell: Is your honor aware that that writ of error to review the Stateler case operates as a supersedeas, and ties this fund up in the state court indefinitely?

Mr. Knapp: Not indefinitely; only until it is decided.

Mr. Mitchell: That money should be brought here and distributed by this court.

The Court: If that case is prosecuted only between the parties remaining in that case, and it does not prosecute an appeal on behalf of the bank, I do not see why that money is not left there to be disposed of, and brought into this court.

Mr. Mitchell: It cannot be. The state court has made the order, and the law is plain. The law provides that on the filing of the petition for a writ of error, the citation, and the copy of the writ, in the clerk's office of the court whose action is to be reviewed, the writ shall operate as a supersedeas, and stay all execution. The very object of this matter is to keep that fund from being tied up. The writ of error was obtained simply to test the question of Mr. Stateler's election. The assignment of errors is attached to the second order to show cause.

Mr. Knapp: If your honor please—

The Court: Wait a moment. I do not want to bring on another argument. Who are the parties in that case? I suppose all the parties are the same, all the way through?

Mr. Mitchell: No; they have changed them. In the original case in the superior court the parties were John Chetwood, Jr., plaintiff, the California National Bank of San Francisco, a corporation, S. P. Young, receiver, R. P. Thomas, A. W. Thompson, and Robert A. Wilson, defendants. That was the condition on the appeal to the supreme court,—Thomas appealing from the judgment; Stateler, from the order of July 8th refusing to turn the fund over to him. To get the writ of error out, this is the way it was done. The title of the case, on Thomas' writ of error, is, "The California National Bank of San Francisco, a Corporation, Plaintiff in Error, against R. P. Thomas and John Chetwood, Jr., Defendants in Error." On the Stateler writ of error, it is entitled this way: "The California National Bank of San Francisco and John Chetwood, Jr.,

Plaintiffs in Error, against T. K. Stateler, Agent [he is made a party to the suit now for the first time], S. P. Young, Richard P. Thomas, R. R. Thompson, and Robert A. Wilson, Defendants in Error." The injunction says there shall be no further litigation, yet they made Stateler a party in the very face of the injunction.

Mr. Knapp: Here is the second writ of error, and the first citation. On the first citation we have indorsed an application to amend.

Mr. Mitchell: This is the first time that Mr. Stateler was made a party to any action. He was not a party to the suit before; never was made a party; never succeeded Mr. Young; never substituted. This is the title of the case in the supreme court of the state of California (handing book to the court).

Mr. Knapp: May I call your honor's attention to the writ of error itself? I think your honor will see that that case can be continued in the name of Mr. Chetwood alone, and leave the bank out. (Counsel reads.)

The Court: The trouble, I see now, is this: that, in these injunction proceedings here, Mr. Chetwood was commanded to refrain from interfering in the matter of the distribution of this money. The injunction is as follows:

"The respondent Chetwood is restrained and enjoined from commencing any further suits to collect any outstanding debt due said bank, whether the same be evidenced by open accounts, bills, notes, or judgments, or otherwise, or from in any way whatever taking or attempting to take any control or possession of any of the funds or assets or property of the said bank, and from settling and allowing, or attempting to settle or allow, any attorney's charges, or any other fees, expenses, or costs growing out of, or which it may be claimed grew out of, any past litigation in this matter."

I have already determined that the respondents cannot have any allowance made out of that fund in the superior court. That fund properly belongs here. It seems to me that, if I allow Chetwood to prosecute this writ of error, I practically set aside and contradict the other order that the respondents shall do nothing with it. That is to say, if I should hold that they should not prosecute that case simply in the name of the bank, I would allow them to go on with that case to the supreme court, although I have already, in these other proceedings, indicated that they should have nothing to do with it. If I am going to be consistent, if my first order is properly founded on the jurisdiction of the court, it certainly ought to restrain the respondent from prosecuting that suit at all.

Mr. Mitchell: Is your honor aware that they ask to have it adjudged by the supreme court that this money shall not come to your honor's receiver?

The Court: That is the point.

Mr. Mitchell: It sets the injunction aside, and all this work of months will have been for nothing.

The Court: My opinion is that the respondents will have to abandon the writ of error in the Stateler case.

The judgment of the court is that Mr. Knapp has been guilty of contempt of court in the Stateler case, in taking the writ of error; but in view of all the matters that have been set forth, and in view

of the representations that have been made that he misunderstood that concluding clause, the judgment of the court is that he pay the costs of these proceedings.

I will call attention to the fact that in one of these cases there is a form of order which might be well followed in this case, which goes a little further than the contempt. It indicates what the respondents must further do.

Mr. Mitchell: In the Tyler case?

The Court: Yes. The judgment of the court is that Mr. Chetwood, the respondent, has been guilty of contempt of court in the two matters involved in the second order, and that with respect to that, in view of all the matters that are presented here, he will be required to pay the costs of these proceedings.

In regard to the first case, there is a feature that commends itself a little more to the favorable consideration of the court, as Mr. Chetwood has indicated he withdrew the proceedings a few days after the court refused to modify the injunction. Still, it was a technical contempt of court. I ought to say that Mr. Chetwood came to me, apparently in good faith, and asked me the meaning of the order. Upon being informed, he went immediately out to the superior court, and appears to have withdrawn the application, so that that is merely a technical violation of the order of the court.

Mr. Mitchell: Your honor's order will be that Mr. Chetwood is guilty both as to the first and second order to show cause, and sentenced to pay the costs of the proceedings?

The Court: Yes.

Mr. Mitchell: They amount to nothing. It is only a technical matter, anyhow. All I have desired in this matter, was to have your honor do just what you have done; to have this fund brought to this court and distributed, and have the litigation in reference to that fund ended. As regards the fight between Mr. Chetwood and Mr. Thomas, that can go on for the balance of the generation. I understand that your honor says they shall not use the name of the bank, even in that matter, because it is a violation of the injunction. In preparing this order, which your honor has signified is the judgment of this court, I will follow the Tyler case, and the Rhode Island case which I read yesterday. It will be ordered that this writ of error be dismissed. I ask that your honor follow closely that decision in the Rhode Island case, and give them a definite time in which to dismiss it, because, until that writ of error is dismissed, I cannot get any action from the state court as to the funds.

The Court: I will make it 20 days.

Mr. Knapp: It can hardly be done in so short a time. The record must be sent there.

Mr. Mitchell: It can be dismissed to-day. The authorities are all one way on that. They do not have to wait until the record is filed in the clerk's office to dismiss the writ of error. Mr. Foster, in his Practice, sets down how that is done.

The Court: I will give them 20 days.

Mr. Mitchell: Within what time will your honor require them to produce the evidence of that dismissal to your honor?

The Court: Twenty days.

Mr. Knapp: Twenty days in which to make the dismissal?

The Court: No; to produce the evidence of it.

Mr. Knapp: We will have 10 days after that, or 5 days, any way.

Mr. Mitchell: Why cannot it be dismissed now, and then give them 20 days to produce the evidence of it?

The Court: I will not require them to do that now, but they must dismiss it, and in 20 days produce the evidence of it.

Mr. Mitchell: The order will so specify?

The Court: Yes.

Mr. Mitchell: Both these gentlemen are officers of this court. I suppose it is distinctly understood that when this proceeding is dismissed, and an application made to the superior court of the state, there will be no further obstacle thrown in the way of turning this money over to your honor's receiver?

The Court: I do not know that I can go any further than I have. You can endeavor to get them to agree that they will behave themselves, perhaps. In the second proceeding Mr. Holt has not been served, I understand?

Mr. Mitchell: It can be dismissed as to Mr. Holt. There is an order to show cause, returnable yesterday, and continued until to-day.

The Court: That is withdrawn, I understand?

Mr. Knapp: Yes; mainly because Mr. Thompson repudiated it.

The Court: That ends that.